Filed 7/24/15  P. v. Ospino CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067423 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1103256) |
| DELIO MARTIN OSPINO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, William Jefferson Powell IV, Judge.  Affirmed.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Peter Quon, Jr. and Martin E. Doyle, Deputy Attorneys General, for Plaintiff and Respondent.

Delio Martin Ospino appeals from a judgment convicting him of false imprisonment, sexual penetration with a foreign object, and other offenses arising from

his sexual assault on the victim. He raises two claims of instructional error: (1) the court erred by instructing the jury that Spanish language recordings, not the corresponding English language transcripts, were the evidence, and (2) the court erred by failing to give a unanimity instruction for the sexual penetration count. He also asserts the court erred by admitting uncharged sex offense evidence. As to sentencing, he contends the term for the false imprisonment count should have been stayed under Penal Code section 654.[1] We find no reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On April 9, 2011, the victim's pastor (Jorge Ruano) took the victim to defendant's office to see if he could assist her with the paperwork needed for her divorce. In addition to his document preparation business, defendant served as a pastor, and the victim had heard him preach at her church on one occasion but did not otherwise know him. A few days after their initial meeting, on April 16, defendant texted the victim asking if she would come assist him at his office because his secretary would be gone. He also invited her to dinner so they could discuss her divorce paperwork. The victim arrived at defendant's office around noon, and defendant had her perform receptionist duties at the front desk.

When defendant and the victim left for dinner, they initially drove their separate cars, but after a stop at a gas station, the victim parked in a parking lot and joined defendant in his car so he could drive them to a beach town for dinner. When they

---

[1]     Subsequent unspecified statutory references are to the Penal Code.

2

arrived at the beach town, they did not go to a restaurant but instead walked around the area.  Defendant then told the victim they were going to "look at the papers at his house."  The victim agreed to go with him because he told her that he had the papers needed for her divorce at his house.

Defendant drove them to his home at a trailer park.  After changing his clothes, defendant summoned the victim into his bedroom to join him.  Defendant was on the bed and he told the victim to "get naked."  The victim said, "you are a pastor, you are a church reverend and I'm your sister from the church, why are you asking me to do that?"  Defendant became very angry and yelled at her, saying "from now on you are no longer my sister and I'm no longer your pastor.  You are a woman and I'm a man."  When he yelled at her, she became afraid.  He told her he wanted her to get undressed; at first she told him she was embarrassed, but then she complied with his demand and undid her dress.

Defendant threw the victim face down on the bed, grabbed her hair, and started to bite her neck and back, saying "yell, bitch, that's how I like it.  That excites me, bitch."  The victim told him to stop and that he was hurting her.  He ordered her to undo her bra and, feeling afraid, she complied.  Defendant pulled down her underwear and "started to insert his fingers in [her] vagina several times" which hurt her "a lot."  Still pulling on her hair, he turned her "face up" and again started to put his fingers in her vagina.  She was telling him it was hurting her, but defendant continued saying, "yell, bitch, . . . because that excites me.  You are my bitch . . . when I go to the swap meet I'm going to buy you a collar that says you are my bitch and I'm going to put it on you."  The victim told him to

3

leave her alone and stop because he was hurting her. Defendant continued putting his fingers into her vagina, and he also was putting his fingers in her mouth and saying "tell me bitch, tell me what are you going to do when I put my semen in your mouth." When the victim did not respond, he started slapping her so she would answer, telling her she had to say that she would swallow his semen. The victim refused to say this, but eventually complied as defendant hit her several times.

Defendant then put the victim face down and on her side, and he repeatedly put "his fingers in [her] anus." He used his knee to push his hand into her anus so that "it would be with more force," and he was pulling and grabbing her "chest" with his other hand. She repeatedly told him to stop and he was hurting her, but he continued to say: "that I should yell, yes, bitch, yell, yell louder. That makes me excited. [¶] . . . [¶] . . . I was his bitch, that I was a whore." The victim was in pain and her anus was bleeding. The victim testified, "I was very afraid because I thought he was going to kill me or do something else because he was hurting me a lot and he would not listen to me."

Defendant grabbed the victim's head so that her "head was like in suspension, facing up." He put his fingers in her mouth and told her that next time he would "penetrate [her] in [her] mouth" and "make [her] swallow his semen," but he would not do that this time because he was going to preach at a church the next day. The victim was afraid, explaining that when he put his fingers in her mouth, she was choking and she was trying to get up but he would not let her. The victim started pushing defendant back so he would let her go, and defendant got up and went to the kitchen. The victim testified the sexual assault in defendant's bedroom lasted for about two hours; the more she "was

4

telling him that he was hurting [her], the more he was getting excited"; and she had been unable to leave because the whole time he was grabbing her hair.

Once defendant went into the kitchen, the victim dressed quickly, and fearful that defendant would not let her go, she grabbed her phone from the living room and pretended she was speaking to her children, saying, "I'm on my way, I'm right here with the pastor." The victim asked defendant if he could take her to her car; he initially said he would not do so until the following day, but then agreed when she told him that her children were waiting for her. When they arrived at the victim's car, defendant said he had "never had a bitch" like her and she had "behaved quite well," and he threw a $20 bill at her and told her to get gas so she could leave. He told her not to tell people at the church or the police about what occurred because otherwise he would get her deported.

Shortly after the assault, the victim contacted her pastor (Ruano) and told him "what this pastor had done" to her. Ruano told her that defendant frequently did this with the women who contacted him for paperwork processing; defendant would threaten to get them deported; defendant was "very powerful" and "always gets his way"; and it would be better for her "to make an arrangement" with defendant and she should ask him for $5,000 and "stay silent." The victim did not initially go to the police because she was afraid of defendant's threats, depressed, and suicidal. However, about 12 days after the assault, she told her sister what had occurred, and her sister took her to the police where she reported the incident.

When the victim started receiving texts from defendant saying he wanted to continue seeing her, she again contacted the police, and a detective asked her to make a

5

pretext phone call to defendant. In the recorded phone conversation, defendant admitted he had put his fingers in the victim's anus, but claimed the sexual encounter was consensual and the force involved was consensual sadomasochism. During the pretext call, the victim mentioned Pastor Ruano's suggestion that she ask defendant for $5,000 to "keep [her] quiet" and asked defendant why Ruano said this to her. A few days later, defendant went to the police and claimed the victim and Ruano were engaging in a conspiracy to extort $5,000 from him. During a recorded interview with a detective, defendant again admitted he penetrated the victim's anus with his fingers and claimed the sexual conduct was instigated by the victim and consensual.

The victim testified she did not tell defendant she wanted to have sex with him and the sexual encounter was not consensual. As a result of the attack, her entire body was hurting; her vagina and anus were bleeding; and she had bruising on her breasts and back from the bites. At the time of trial she suffered from incontinence and had to use a pad on her rectum.

*Uncharged Sex Offense Evidence*

Defendant's ex-wife (D.O.) testified that she and defendant were married from 1991 to 2001, and he was physically and psychologically abusive and sexually violent towards her. Defendant would hold her down and force her to have sexual intercourse and sometimes penetrate her anally when she told him she did not want to do this. D.O. testified the anal penetration was "very much" against her will, and when she told defendant this, he would reply, "it was okay, that he just wanted to release himself." She

6

did not report his conduct to the police because he threatened to take everything away from her including their son.

*Jury Verdict and Sentence*

Defendant was convicted of false imprisonment by violence or menace, sexual penetration with a foreign object, assault by means of force likely to cause great bodily injury, and attempt to dissuade a witness from reporting a crime. The court sentenced him to nine years four months in prison.

DISCUSSION

I. *Claims of Instructional Error*

A. *Instruction Regarding Recordings*

The two recordings submitted into evidence in this case (the pretext call and defendant's police interview) were primarily in Spanish, and the jury was provided with English language transcripts of the recordings. Because the recordings were in a foreign language, defendant argues the trial court violated his constitutional due process and jury trial rights by providing the jury with the standard instruction that the recordings, not the transcripts, are the evidence.

When the prosecutor played the recorded pretext call for the jury, the court told the jury: "So, ladies and gentlemen, *the evidence* should it be admitted into evidence *is the audio recording itself, the CD*. Transcripts are generally made and required in fact so that the listener can understand what is on the tape. Most of the time when people speak in an audio recording, it is not very clear, so we give them transcripts to help them understand. [¶] *This, if you don't speak Spanish, is going to be entirely unclear because*

7

*the phone call's entirely in Spanish.  So the transcript is agreed by both counsel to be sufficiently accurate so that you can understand the CD should you not speak Spanish.*"  (Italics added.)

Similarly, when the prosecutor played the recorded police interview for the jury, the court told the jury:  "You remember what I told you with the previous pretext phone call transcript.  *The evidence is actually the audio and visual portion* of the CD or DVD, whichever it is.  *The transcript is really to help you understand the evidence, but the transcript is not the evidence.*"  (Italics added.)

Counsel made no objection to these instructions.[2]

Generally, it is proper for a court to instruct the jury that a recording is the evidence and a transcript of the recording is a guide to assist with understanding the recording.  (See *United States v. Franco* (9th Cir. 1998) 136 F.3d 622, 626.)  However, the courts have recognized that when the recording is in a foreign language, the English language transcript attains a different evidentiary status.  As explained in *Franco*:  "[T]he relation between tapes and transcripts changes when the tapes are in a foreign language.  When tapes are in English, they normally constitute the actual evidence and transcripts are used only as aids to understanding the tapes; the jury is instructed that if the tape and transcript vary, the tape is controlling.  [Citation.]  When the tape is in a foreign language, however, such an instruction is 'not only nonsensical, it has the potential for

---

2    After the jury's verdict, defendant filed a new trial motion based on the court's instructions concerning the recordings.  The trial court assessed that its instructions were erroneous, but denied the new trial motion based on a finding of no prejudice.

harm where the jury includes bilingual jurors.' [Citation.] We therefore have upheld a trial court's instruction that a jury is not free to disagree with a translated transcript of tape recordings." (*Id.* at p. 626.)

In the case before us, it appears that one or more jurors understood Spanish, whereas others did not. The jurors who could not understand Spanish could have listened to or viewed the recordings to get a sense of demeanor, but they necessarily had to rely on the transcripts for the content of the spoken words. Defendant contends the non-Spanish speaking jurors might not have considered the recordings *at all* (including his exculpatory claims of consent and extortion contained therein) because they were told the transcripts were not evidence and they were unable to understand the recordings. To the contrary, no reasonable juror would have ignored the recordings as an evidentiary item based on the court's instructions. It is not reasonable to assume non-Spanish speaking jurors would have thought they were effectively precluded from considering foreign language recordings that were of significant evidentiary value and for which they had been provided translated transcripts. The court's instructions on this matter could have been clearer, but we are satisfied the jurors fully understood they could rely on the transcripts when considering the recordings as evidentiary items. Although the court told the jurors the recordings, not the transcripts, were the evidence, when addressing the pretext call the court also acknowledged that for non-Spanish speaking jurors the recording would be "entirely unclear" and counsel had agreed the transcript was sufficiently accurate "*so that you can understand the CD* should you not speak Spanish." (Italics added.) Similarly, when addressing the police interview, the court told the jurors

9

the transcript was designed "*to help you understand the evidence*." (Italics added.) Thus, the court effectively told the jurors that the transcript represented the recording for non-Spanish speakers.

Defendant also contends that because the court told the jurors that the recordings, not the transcripts, were the evidence, the jurors might not all have been evaluating the same evidence with respect to the recordings. He posits that Spanish-speaking jurors would have considered only the recordings, not the transcripts, when evaluating the evidence, and because they were *not* told the English language transcripts were controlling, they may have understood the recordings differently and/or may have provided different translations to non-Spanish speaking jurors. We agree it would have been appropriate for the court to have told the jurors that they could not rely on their own translations of the recordings. (*United States v. Franco, supra*, 136 F.3d at p. 626; *People v. Cabrera* (1991) 230 Cal.App.3d 300, 303-304 [juror committed misconduct by exposing fellow jurors to evidence outside the record by providing her own translation of Spanish-language testimony].) CALCRIM No. 121 sets forth such an instruction when the jury is presented with witness testimony or recordings in a foreign language. (See fn. 3, *post*.) However, assuming the court was required to provide this instruction sua sponte, there was no prejudicial error.

Preliminarily, we reject defendant's contention that the claimed error was structural error requiring automatic reversal. (See *People v. Gamache* (2010) 48 Cal.4th 347, 396-397 [jury exposure to matters not in evidence is not structural error]; *People v. Carter* (2010) 182 Cal.App.4th 522, 530-533 [deficient instructions on jury's duties not

10

structural error].) Even if we apply the harmless beyond a reasonable doubt standard for federal constitutional error, the record shows no prejudice. (See *People v. Chavez* (1991) 231 Cal.App.3d 1471, 1482-1483 [applying harmless beyond reasonable doubt standard for error related to possible juror misconduct]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [no reversal for jury exposure to extraneous information if record as whole shows no substantial likelihood of actual harm]; *People v. Cabrera, supra*, 230 Cal.App.3d at pp. 304-305.)

There is nothing in the record to suggest there are different translations of the recordings that might have materially altered a juror's evaluation of these evidentiary items. Further, the jurors *were* instructed in the language of CALCRIM No. 121 that they could not rely on their own translation of the Spanish testimony; i.e., they "must rely on the translation provided by the interpreter" and they could "not retranslate any testimony for other jurors."[3] Reasonable jurors would have understood they likewise could not

---

[3] Using the language of CALCRIM No. 121, the jurors were instructed:
"Some testimony may be given in Spanish. An interpreter will provide a translation for you at the time that the testimony is given. You must rely on the translation provided by the interpreter, even if you understand the language spoken by the witness. Do not retranslate any testimony for other jurors. If you believe the court interpreter translated testimony incorrectly, let me know immediately by writing a note and giving it to the [bailiff]."
The jurors were *not* provided the second portion of CALCRIM 121 addressing foreign language recordings, which states: "You (may/are about to) hear a recording [that is partially] in a foreign language. You will receive a transcript with an English language translation of that recording. You must rely on the transcript, even if you understand the language in the recording. Do not share your own translation with other jurors. Please write a note to the clerk or bailiff if you believe the translation is wrong. [If the recording is partially in English, the English parts of the recording are the evidence.]"

11

retranslate the recordings but they should all rely on the English transcripts provided to them in conjunction with the recordings.

The claimed error in the court's instructions concerning the recordings was harmless beyond a reasonable doubt and caused no impairment of defendant's due process and jury trial rights.[4]

B. *Failure To Provide Unanimity Instruction for Penetration Count*

Defendant argues the sexual penetration conviction (count 2) must be reversed because the trial court failed to provide a unanimity instruction for this count. He contends the penetration charge could be supported by either the evidence of the vaginal penetration or of the anal penetration; the prosecutor did not elect one of these acts as the basis for count 2; and accordingly the court prejudicially erred by failing to tell the jurors they must unanimously agree which act established the penetration count.

A defendant's constitutional right to a unanimous jury verdict requires that when the evidence shows more than one unlawful act that could support a single charged offense, the prosecution must either elect which act to rely upon or the trial court must sua sponte give a unanimity instruction telling the jurors they must unanimously agree which act constituted the crime. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) The unanimity instruction is designed to eliminate the danger the defendant will be convicted even though there is no single offense which all the jurors agreed the defendant committed. (*People v. Norman* (2007) 157 Cal.App.4th 460, 464-465.)

---

[4]     Given our holding on the merits, we need not address the People's forfeiture contention.

Assuming a unanimity instruction should have been given, the error was harmless beyond a reasonable doubt. (*People v. Norman, supra*, 157 Cal.App.4th at p. 466.) Under this standard, the "failure to give a unanimity instruction may be harmless error if we can conclude beyond a reasonable doubt that all jurors must have unanimously agreed on the act(s) constituting the offense." (*Ibid.*)

The record shows beyond a reasonable doubt that all the jurors agreed defendant committed anal penetration of the victim. In the recorded police interview and pretext call, defendant repeatedly and explicitly stated or acknowledged he engaged in anal penetration, but claimed it was consensual. For example, during the police interview defendant said, "then all of a sudden she turned around and said for me to put my fingers in her asshole. . . . [¶] . . . [¶] I stuck my middle finger in her anus, when I inserted my finger about half way in her anus I felt that she tighten up too much, I do not know if she did that purposely or because she was nervous"; "I felt that she tightened her anus, my fingers felt tight . . . . [¶] . . . [¶] I could not take my fingers out"; "I knew that there was something wrong when I put my fingers in her anus . . . . I also said that she tightened up and I couldn't take my fingers out"; "The only thing that she can accuse me [of], is putting my fingers in her anal, and I'm not denying that."

Similarly, during the pretext call, the following exchanges occurred: "VICTIM: So putting fingers in the anus is not a violation? [¶] SUSPECT: Well, if I did that with force"; "VICTIM: . . . I had to go to the doctor for a problem, because the other day I woke up with my anus very injured, yes. [¶] SUSPECT: . . . It's possible that that happened . . . ."; "VICTIM: . . . You were inserting you[r] fingers in my anus. . . . [¶]

13

SUSPECT:  It wasn't something against your will because we were on fire.  [¶]  VICTIM:  No. . . .  I was telling you that you were hurting me, and you; nevertheless, kept inserting your fingers, and I was telling you that it hurt, and you were pulling my hair on my head. . . . [¶] . . . [¶] SUSPECT:  I ask you for forgiveness. . . .  But . . . we were an act with much force, and I was convinced it was real—"; "VICTIM:  So, just . . . admit the truth . . . that you inserted your fingers in my anus, that you hurt me.  I even had to go to the doctor at the hospital, and still I'm suffering with those problems.  [¶]  SUSPECT:  But . . . that was an act between two persons when there is sadomasochism, it's like that."

The jurors' guilty verdict reflects they rejected defendant's consent defense, and once they did this, there was no basis for them to have rejected a finding of anal penetration given defendant's clear, detailed, and explicit admissions of this act.  Regardless of the jury's determination concerning the vaginal penetration claim, we have no doubt all the jurors agreed defendant committed anal penetration.  There was no prejudice arising from the absence of a unanimity instruction.

## II.  *Admission of Uncharged Sex Offense Evidence*

Defendant argues the trial court erred by admitting into evidence the uncharged sex offense evidence presented through the testimony of his ex-wife.  He asserts the evidence should have been excluded because it was factually dissimilar from the charged sex offense, was unduly prejudicial, and may have caused the jury to convict him of the charged sex offense based on a desire to punish him for his past misconduct towards his ex-wife.

14

The prosecution made a pretrial motion to admit the uncharged sex offense evidence to show defendant's proclivity to commit sex offenses as permitted by Evidence Code section 1108, arguing the evidence had significant probative value and was not unduly prejudicial. The court weighed the evidence under Evidence Code section 352 and, over defense objection, ruled it was admissible. The jurors were provided a standard instruction stating that if the prosecution proved by a preponderance of the evidence that defendant committed the uncharged offenses of spousal rape and sexual assault, they could consider the evidence for purposes of the count 2 sexual penetration charge; they could, but were not required to, conclude defendant was inclined to commit sex offenses and was likely to and did commit the count 2 offense; and the uncharged sex offense evidence was only one factor to consider along with all the other evidence and was insufficient by itself to prove guilt beyond a reasonable doubt of the charged sex offense.[5] (See CALCRIM No. 1191.)

A. *Governing Law*

Evidence Code section 1108 sets forth an exception to the general rule against the use of evidence of a defendant's misconduct apart from the charged offense to show a propensity to commit crimes. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 989-990.) When a defendant is charged with a sex offense, Evidence Code section 1108

_____

[5] In his opening brief on appeal, defendant mistakenly assumed the uncharged sex offense evidence was presented to the jury under both Evidence Code sections 1108 and 1101, subdivision (b), and he challenged its admissibility under both of these sections. In his reply brief, he appears to recognize the evidence was presented to the jury under only Evidence Code section 1108.

15

allows admission of evidence of other sex offenses to prove the defendant's disposition to commit sex offenses, subject to the trial court's discretion to exclude the evidence under Evidence Code section 352.  (Evid. Code, § 1108, subd. (a); *Robertson*, at p. 990.) Evidence Code section 1108 is premised on the recognition that sex offense propensity evidence is critical in sex offense cases " 'given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' "  (*People v. Falsetta* (1999) 21 Cal.4th 903, 918 (*Falsetta*).)

Based on Evidence Code section 1108, the presumption is in favor of the admissibility of other sex offense evidence; however, the evidence should not be admitted in cases where its admission could result in a fundamentally unfair trial. (*People v. Loy* (2011) 52 Cal.4th 46, 62; *People v. Falsetta, supra*, 21 Cal.4th at p. 917.) To safeguard a defendant's fair trial rights, the trial court is required to engage in a careful weighing process under Evidence Code section 352 to determine whether the probative value is substantially outweighed by the danger of undue prejudice, confusion, or time consumption.  (*Falsetta*, at pp. 916-917.)  When making this evaluation, similarity between the prior and current sex offenses is a relevant factor to consider (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285); however, there is no strict similarity requirement for admission of the evidence (see *People v. Loy, supra*, 52 Cal.4th at p. 63; *People v. Robertson, supra*, 208 Cal.App.4th at p. 991).  Undue prejudice does not exist merely because highly probative evidence is damaging to the defense case, but rather arises from evidence that uniquely tends to evoke an emotional bias against the defendant or cause

16

prejudgment of the issues based on extraneous factors. (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)

The decision whether to apply Evidence Code section 352 to exclude otherwise admissible evidence " 'is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*People v. Falsetta, supra*, 21 Cal.4th at pp. 917-918.) On appeal we will not disturb the trial court's ruling unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Lewis, supra*, 46 Cal.4th at p. 1286.)

B. *Analysis*

As set forth above, the uncharged sex offense evidence was admissible under Evidence Code section 1108 as propensity evidence, subject to the court's discretion to exclude it under Evidence Code section 352. The trial court reasonably declined to exclude the evidence under Evidence Code section 352. In both the charged and uncharged offenses, defendant engaged in forcible sexual conduct against women, including conduct that involved anal penetration. The current victim and defendant's ex-wife were initially voluntarily in defendant's presence; defendant then inflicted violent sexual behavior on them; and he threatened repercussions if they went to the police. The conduct against the current victim was highly violent and demeaning, and the conduct against defendant's ex-wife was not so qualitatively different as to raise a concern of an undue emotional impact on the jury. Further, the court could reasonably conclude that the fact defendant was not punished for the prior misconduct was not alone enough to tip the scale towards undue prejudice given that the prior sex offense evidence had

17

significant probative value and it was not disproportionately inflammatory when compared to the current charged offense.

The court did not abuse its discretion in admitting the uncharged sex offense evidence.

III. *Claim that Sentence for False Imprisonment Should Have Been Stayed*

Defendant's sentence (totaling nine years four months) consisted of an eight-year upper term for the sexual penetration count and two consecutive eight-month sentences for the false imprisonment and witness dissuasion counts (one-third the two-year midterm).[6] Defendant argues that when committing the false imprisonment and sexual penetration offenses he had a single objective; i.e., to commit the sexual assault. Accordingly, he argues the sentence on the false imprisonment count should have been stayed under section 654.

Section 654 prohibits multiple punishment under different statutory provisions for a single physical act or for two or more physical acts that are part of one indivisible transaction. (*People v. Jones* (2012) 54 Cal.4th 350, 358; *People v. Mesa* (2012) 54 Cal.4th 191, 199.) The purpose of section 654 is to ensure a defendant's punishment is commensurate with his or her culpability. (*People v. Capistrano* (2014) 59 Cal.4th 830, 886.) The divisibility of a transaction involving multiple acts depends on whether the defendant had an independent objective for each offense. (*Id.* at pp. 885-886; *People v. Harrison* (1989) 48 Cal.3d 321, 335.)

---

6      A two-year sentence on the assault count was stayed under section 654.

If a defendant had multiple criminal objectives that were independent of and not merely incidental to each other, he or she may be punished for each statutory violation committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Harrison, supra*, 48 Cal.3d at p. 335.) The courts recognize that " 'at some point the means to achieve an objective may become so extreme they can no longer be termed "incidental" and must be considered to express a different and more sinister goal than mere successful commission of the original crime.' " (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 272.) For example, a defendant's conduct of falsely imprisoning and raping the victim can reasonably be found to reflect multiple objectives under circumstances where the defendant tied up the victim "to the point where she almost strangled to death." (*People v. Manning* (1982) 133 Cal.App.3d 159, 169.) In contrast, a defendant's conduct of kidnapping and raping the victim can reflect only a single objective under circumstances where the kidnapping was confined to driving the victim to secluded areas. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1206, 1216; see *People v. Martinez* (1980) 109 Cal.App.3d 851, 858.)

On appeal, we apply the substantial evidence standard to review the court's express or implied finding that the defendant had separate objectives while engaging in the multiple acts. (*People v. McKinizie* (2014) 54 Cal.4th 1302, 1368-1369.) We view the evidence in the light most favorable to the court's determination, and presume in support of the court's conclusion the existence of every fact that could reasonably be deduced from the evidence. (*People v. Cleveland, supra*, 87 Cal.App.4th at p. 271.)

19

The record supports the court's finding of multiple objectives during the false imprisonment and sexual penetration committed by defendant. The court could reasonably find defendant did not forcibly confine the victim to his bedroom in a manner that merely prevented her from leaving so he could assault her sexually. Rather, the court could assess that the false imprisonment included conduct that terrorized the victim far beyond the forcible restriction of her movement for purpose of committing the sexual assault. The defendant inflicted fear in the victim and physically and psychologically restrained and intimidated her by yelling at her, throwing her face down on the bed, grabbing her by the hair, biting and slapping her, calling her derogatory names, and jamming his knee against his fingers as he anally penetrated her. The encounter in the bedroom lasted for two hours; the victim was unable to leave because "the whole time he was grabbing [her] hair"; and the victim thought defendant was going to kill her. The court could further find that, even after finishing the sexual assault, defendant continued the false imprisonment by grabbing the victim's head "like in suspension," inserting his fingers in her mouth to the point of choking her, and threatening what he was going to do "next time."

These facts support that defendant falsely imprisoned the victim to terrorize her as well as to commit the sexual assault. Based on the distinct objective of terrorizing the victim, defendant could properly be punished both for the false imprisonment and the sexual penetration.

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


NARES, Acting P. J.


AARON, J.